**2023 UT App 140**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
JUSTIN RICHARD JESSOP,
Appellant.

Opinion
No. 20210544-CA
Filed November 16, 2023

Second District Court, Ogden Department
The Honorable Michael D. DiReda
No. 191902276

Emily Adams, Freyja Johnson, Melissa Jo Townsend,
and Scott D. Goodwin, Attorneys for Appellant,
assisted by law students
Jared Erekson and Rachel Johnson[1]

Sean D. Reyes and Natalie M. Edmundson,
Attorneys for Appellee

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGES RYAN D. TENNEY and JOHN D. LUTHY concurred.

ORME, Judge:

¶1     Justin Richard Jessop appeals the district court's denial of his motion seeking dismissal of the two charges against him for assault against a peace officer, arguing that the court erred in holding that *State v. Tiedemann*, 2007 UT 49, 162 P.3d 1106, does not apply where the possibly exculpatory evidence never came into existence. He also appeals the court's denial of his motion to suppress evidence gathered from police questioning that took

---

1. *See* Utah R. Jud. Admin. 14-807 (governing law student practice in the courts of Utah).

place in the hospital after he was shot by police, arguing that the court incorrectly held that he was not in custody at the time of questioning. Because we conclude that *Tiedemann* does not apply to evidence that never existed, and because we agree that Jessop was not in police custody when he was first interviewed at the hospital, we affirm.

BACKGROUND[2]

¶2     Jessop and Lily[3] were romantically involved. One night in early June 2019, Lily reported to police that, during a heated argument, Jessop retrieved a handgun, pointed it at her head, and pulled the trigger. But because there was not a live round in the gun's chamber, the gun did not go off. Jessop then turned the gun on himself and pulled the trigger. For the same reason, the gun again did not fire. He told Lily that if she called the police there would be a "blood bath" and, at one point, he threatened to kill her. Understandably, Lily fled the house and called the police, but Jessop continued to send her text messages. Following Lily's flight from the house, Jessop "fired a .40 caliber handgun" and "a 9mm handgun" from his front porch and sent Lily a text message saying, "I'm gonna go bad on these fuckers."

¶3     Based on Lily's report, the police understood Jessop to be a restricted person who could not legally possess firearms. Officers from the local SWAT team were called, but they discovered that Jessop had left the house. Police contacted Jessop via his cell phone and requested that he turn himself in. He refused, and the police began searching for him. Though refusing to turn himself

---

2. "In reviewing the trial court's ruling on a motion to suppress, we recite the facts in the light most favorable to the trial court's findings." *State v. Fullerton*, 2018 UT 49, ¶ 4 n.1, 428 P.3d 1052 (quotation simplified).

3. A pseudonym.

in, he continued to talk with a police negotiator, and the police were able to "ping" his phone and direct officers to Jessop's approximate location. But they were unable to find him. Subsequently, two Weber County Sheriff deputies (Deputy 1 and Deputy 2) were assigned to assist in finding Jessop, and they received updates regarding Jessop's location.

¶4     After responding to multiple ping locations where Jessop was said to be without finding him, the deputies responded to an updated location and spotted a lone man walking down the street, whom Deputy 1 identified as Jessop. Deputy 1 later recounted to an investigator that on recognizing Jessop, "He opened his door, got out of the vehicle before it was put in park, and started giving commands to Mr. Jessop." But Jessop did not stop or show both of his hands, as instructed, and he began to run down a rugged trail.

¶5     Following Deputy 1's identification of Jessop, Deputy 2 exited his vehicle and "attempted to send his dog after [Jessop] but the dog did not see him and started going the other way." Disregarding his dog, Deputy 2 returned his attention to Jessop and later indicated that he saw Jessop's "cell phone being held to his head with one hand" while "[t]he other hand [was] hidden from [Deputy 2's] view." Both deputies indicated that they continued to command Jessop to "show your hands," to which Jessop responded that he would not and at one point stated, "Fuck you." Following this exchange, the deputies recounted that Jessop "turn[ed] and present[ed]—and point[ed] a handgun at" them. At this realization, Deputy 2 "fired two rounds at [Jessop], and realizing that he had no cover, dropped to the ground and continued to fire at [Jessop] until [he] was no longer a threat." Deputy 1 also saw Jessop point a gun in his direction and fired his weapon at Jessop.

¶6     During the entirety of this encounter, both deputies were wearing body cameras, but neither deputy activated his body

camera until "shortly after" they fired at Jessop. As recounted in a medical report, Jessop sustained multiple serious injuries from being shot "once in the back, once in the posterior hip region, once in the face and once in the wrist." After being shot, Jessop was handcuffed and searched. The search revealed that Jessop possessed two handguns. Due to the severity of Jessop's injuries, his handcuffs were removed following the search, and he was taken to the hospital, accompanied by a SWAT medic.

¶7     Following the shooting, an Ogden City Police detective (Detective) came to the scene of the shooting to be briefed on a domestic violence and officer-involved shooting case. Detective testified that once on the scene, he was assigned to investigate the domestic violence that preceded the officer-involved shooting. He recounted that as part of his briefing on the domestic violence, he was informed that Jessop "had a gun pointed at him" but he was not informed that Jessop had pointed a gun at the deputies. Detective further recounted that he concluded "it could be a possibility" that Jessop was a restricted person because, although it was suggested by Lily, Jessop's status as a restricted person was at that point "uncertified."

¶8     Jessop was admitted to the hospital in the early hours of June 3, 2019, where he promptly underwent surgery. He was placed in the ICU around 6:00 a.m. Because of the major surgery and associated consequences, hospital staff implemented a regimen of powerful pain medications and sedatives. But beginning at around 5:30 p.m. that same day, hospital staff began to "detoxify" Jessop and did not administer any further doses of certain powerful medications—specifically a short-acting sedative and a highly addictive pain medication. Although Jessop was detoxifying from the more powerful medications, hospital staff continued to monitor and mitigate Jessop's pain, administering other pain medication again around 8:00 p.m.

¶9 At some point, hospital staff reached out to Detective and said that Jessop was "awake and communicating" and that he was "making statements about wanting to unplug his medical devices," which raised concerns that he was suicidal. On the heels of this communication, Detective and a second detective arrived at the hospital by around 8:00 p.m. to fill out an involuntary commitment order as requested by hospital personnel and to interview Jessop regarding the domestic violence incident. Prior to the interview, Jessop's nurse advised the detectives that Jessop was communicating well and that he "would be able to answer their questions appropriately." Jessop's nurse testified that Jessop "was able to understand her questions, did not have any difficulty answering her questions and . . . had been given doses of" powerful sedatives and pain medications "prior to the detectives arriving but the side effects of those medications had worn off prior to the interview."

¶10 Before beginning the interview, Detective informed hospital staff that Jessop did not need to be guarded "as he was not being detained, was not in custody at that time," was "absolutely not a suspect," and was "a free person." The detectives also advised Jessop directly "that he was not under arrest" and was "not being detained" and "that they just want[ed] to get his side of the story" but "he was not under any obligation to talk to them."

¶11 At around 9:00 p.m., the detectives began interviewing Jessop. For the duration of the interview, the door to the hospital room was open so anyone could come in or leave the room at any time, and Jessop was not placed in handcuffs or otherwise restrained by the detectives. The State maintains that the interview lasted approximately 30 minutes and consisted of mostly "yes or no" questions, which Jessop responded to through nonverbal actions and in writing. Detective testified that during the interview, there were "only nods and yeses and [answers] in written form on a . . . clipboard with a magic marker and a paper."

Detective further testified that Jessop was "coherent" and "was able to track [their] conversation," even though he was experiencing a visible degree of discomfort during the interview. But this discomfort did not affect his ability to answer the detectives' questions, although at one point he asked Detective to stop the interview to clarify a previous answer.

¶12 At the beginning of the interview, Jessop asked the detectives whether he was under arrest. Responding to the question, Detective said, "You've been shot; you could be a victim." Then, near the end of the interview, Jessop asked what he was charged with, and Detective responded, "Nothing yet. I say yet, though, because possibly." At the end of this interview, Detective asked Jessop whether they could return the next day to ask more questions. Jessop responded by nodding his head in the affirmative.

¶13 Jessop was "not arrested or detained and remained out of custody for approximately three months prior to being booked into . . . [j]ail for his pending charges" of, in relevant part, two counts of assaulting a peace officer. Following his arrest, Jessop elected to waive his preliminary hearing, and the case was set for trial. Jessop filed both a motion to suppress evidence gathered from the detectives' first interview[4] and a motion to dismiss all charges.

*Motion to Suppress Evidence*

¶14 In his motion to suppress evidence, Jessop cited the seminal case of *Miranda v. Arizona*, 384 U.S. 436 (1966), and asserted that "an individual has a Fifth and Fourteenth Amendment right to remain silent as well as a Sixth Amendment right to counsel in all criminal proceedings" but that "[t]hose rights may be effectively waived when the interrogating officer

---

4. Jessop was interviewed on other occasions, but these interviews are not at issue in this appeal.

reads the '*Miranda* rights' admonition and receives a waiver from the defendant." Jessop argued that the detectives' questioning qualified as a custodial interrogation and that he had thus been "entitled to a valid *Miranda* warning during his interview with detectives on June 3rd, 2019." Jessop relied on our Supreme Court's decision in *State v. Levin*, 2006 UT 50, 144 P.3d 1096, arguing that a "custodial interrogation occurs, and *Miranda* warnings are required where there is both: (1) custody, and (2) interrogation." *See id.* ¶ 34. Quoting *Miranda*, Jessop asserted that custody attaches "after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. He also asserted that interrogation can be "either express questioning or its functional equivalent" involving "words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response." *See Rhode Island v. Innis*, 446 U.S. 291, 300–02 (1980) (emphasis omitted).

¶15 Expanding on his assertion that he was interrogated while in police custody, Jessop reasoned that after he was shot by the deputies, which was the sole reason he was hospitalized, "police handcuffed him and conducted a search incident to arrest" before he was transported to the hospital while "accompanied by a SWAT medic." He argued that "[w]hile bedridden inside an intensive care unit at the hospital, [he] was questioned by Detectives . . . , who were there to investigate the alleged domestic violence and weapons crimes." He further argued that "[t]he detectives' questions amounted to an interrogation, as they were intended to, and did in fact, [elicit] inculpatory responses from [him]." Based on these assertions, Jessop reasoned that he had been subjected to a custodial interrogation that entitled him to his *Miranda* warning prior to questioning. And absent that warning, he contended, his statements should be suppressed.

¶16 The State opposed the motion, arguing that Jessop's "Fifth Amendment rights were not violated as the *Miranda* rights were

not required because [he] was not in custody." The State quoted our decision in *State v. Maestas*, 2012 UT App 53, 272 P.3d 769, reiterating that

> the Utah Supreme Court has identified four factors that aid in determining whether a person is in custody for *Miranda* purposes: (1) the site of interrogation; (2) whether the investigation focused on the accused; (3) whether the objective indicia of arrest were present; and (4) the length and form of interrogation.

*Id.* ¶ 50 (quotation simplified). *See Salt Lake City v. Carner*, 664 P.2d 1168, 1171 (Utah 1983).

¶17   The State contended that after applying those four factors to the totality of the circumstances surrounding the detectives' interview, Jessop was not in custody for purposes of *Miranda* and, thus, his *Miranda* rights were not triggered and waiver of those rights was not required. In support of this contention, the State argued the following:

> First, [Jessop] was in a large patient room, he was not restrained to the bed in any way other than for medical purposes and the door was open. Second, during the first interview the detectives did not indicate that [Jessop] was under suspicion of any crime, instead they told [him] they just wanted to get his side of the story and even when [he] asked "what am I charged with," [Detective] responded "nothing yet!" . . . . Third, the detectives did not position themselves in a way that was threatening or menacing, did not inform [Jessop] he was under arrest, informed medical personnel that they did not need to post an officer outside the room and did not make any suggestion or movements that they would use their handcuffs. Finally, the detectives

did not tell [Jessop] that he had to speak with them at any time, they only asked minimal question[s] that were investigatory in nature and the first interview lasted only approximately thirty minutes[.]

¶18 Following argument, the court ruled from the bench. The court first stated that "it's a close call, admittedly, because . . . [Jessop] clearly [was] in the hospital because he'[d] been shot." But the court noted that its focus centered on the crucial question of "what a reasonable person would believe under the circumstances." The court indicated that "[w]hen you look at the indicia of arrest, it seems like there just isn't any indicia of arrest. He's just in a hospital room convalescing from some very serious wounds that he received." The court made mention of Detective's indication to Jessop "that his focus was not on [Jessop] as a suspect," that "[h]e was just trying to figure out what had happened and whether [Jessop] was a victim or whether he was a perpetrator," and that Jessop "wasn't necessarily being targeted as a suspect."

¶19 The court then considered the initial interaction between Jessop and the detectives and noted that when the detectives first approached Jessop, they inquired, "Is it okay if we talk to you for a minute and get your side of the story?" The court commented that the detectives' approach was permissive, which it thought was "important." The court's focus then turned to the pivotal exchange where Detective informed Jessop that he was "not under arrest," to which Jessop responded by inquiring again if he was under arrest. Jessop's nurse confirmed Detective's earlier statement that Jessop was not, in fact, under arrest. The court determined that a reasonable person in Jessop's circumstances would not have considered themselves to be custodially detained by the police even if the person had been previously detained at the scene of a shooting and was later hospitalized, because there was a detective saying, "You're not under arrest. You're not being

detained. We're just here to get your side of the story. Can we chat with you so we can get all sides of the story?" And the court noted that several of these statements were confirmed by a hospital nurse. Thus, the court determined that because Jessop was not in police custody at the hospital, he had not been subjected to custodial interrogation requiring a recital of the *Miranda* warnings. The court consequently denied the motion to suppress.

*Motion to Dismiss*

¶20 In his motion to dismiss, Jessop focused on the deputies' failure to activate their body cameras prior to the shooting. Jessop argued that the deputies violated his right to a fair trial when, after locating him, they exited their vehicles without activating their body cameras. Quoting *State v. Stewart*, 544 P.2d 477, 479 (Utah 1975), he argued that the "right to a fair trial . . . is violated if 'those charged with the prosecution, including police officers,' deliberately destroy or fail to preserve evidence that is material to the guilt or innocence of the accused." He then cited *State v. Tiedemann*, 2007 UT 49, 162 P.3d 1106, contending that our Supreme Court adopted a "two-part test for analyzing whether dismissal is appropriate in cases involving the loss, destruction or failure to preserve material evidence." *See id.* ¶ 44. He asserted that under *Tiedemann*, a court must consider

> (1) the reason for the destruction or loss of the evidence, including the degree of negligence or culpability on the part of the State; and (2) the degree of prejudice to the defendant in light of the materiality and importance of the missing evidence in the context of the case as a whole, including the strength of the remaining evidence.

*Id.*

¶21 Jessop argued that under the first part of the *Tiedemann* test, "by failing to activate their body worn cameras prior to engaging

[him], [the deputies] failed to preserve video evidence of what actually happened in the moments leading up to and during the shooting." Jessop further argued that the deputies' failure was "negligent *per se*" because under section 77-7a-104(4) of the Utah Code "the officers were required . . . to 'activate the body-worn camera prior to any law enforcement encounter, or as soon as reasonably possible,'" and "[t]here was no reason why the officers in this case would have been unable to activate their cameras prior to engaging [him]." Under the second part of the *Tiedemann* test, Jessop contended that "in light of the material value of [the body camera] evidence," the "degree of prejudice . . . [was] extremely high." Based on these arguments, Jessop contended that "both prongs of the test weigh in favor of dismissal" and requested that the court "dismiss all charges."[5]

¶22 In response, the State contended that the deputies had complied with section 77-7a-104(4) "[i]n that they activated their body worn cameras as soon as reasonably possible given the circumstances they were confronted with." *See* Utah Code Ann. § 77-7a-104(4) (LexisNexis Supp. 2022).[6] The State argued that section 77-7a-102(3) directly addressed law enforcement's utilization of body cameras and specifically provided that chapter 7a of title 77 "does not require an officer to jeopardize the safety of the public, other law enforcement officers, or himself or herself in order to

---

5. Jessop's motion requested that the district court dismiss this matter in its entirety. At the hearing, however, defense counsel indicated that the defense was not asking the court to dismiss the entire case but instead just the charges pertaining to what the deputies' body camera footage would likely have revealed.

6. Because the applicable provisions of the Utah Code in effect at the relevant time do not differ from those currently in effect in any way material to this appeal, we cite the current version of the code for convenience.

activate or deactivate a body-worn camera." *See id.* § 77-7a-102(3) (2017).

¶23 The State argued that when the deputies finally encountered Jessop after responding to multiple possible locations, they were operating on information that he had pointed a gun at Lily and threatened to kill her, "that he was armed with two handguns, that he had fired off two shots in a residential neighborhood, that he was a convicted felon and a restricted person, and that he had said that if police were called, there would be a bloodbath." The State argued that "[b]ased on all those factors, the deputies were legally obligated to take [Jessop] into custody to make sure he did not endanger anyone else." The State noted that the deputies "were confronted with an on-going emergency and requiring them to stop what they were doing and take their attention away from this dangerous suspect in order to insure that their cameras were activated . . . is the very type of circumstance that was intended when the legislature left the exception '*or as soon as reasonably possible*' in" section 77-7a-104(4). The State further contended that "[a]s soon as the threat to the public and to the officers was alleviated, [the deputies] turned on their cameras."

¶24 The court also ruled on this motion from the bench. The court said: "Because nothing was destroyed, this isn't a destruction case. If anything, it's a failure to preserve case, which *Tiedemann* doesn't actually speak to." The court considered the "reasonableness or the reason for the lack of preservation of this evidence" and "the reasonable thoughts an officer would have" under the circumstances described above. In its consideration of the deputies' actions, the court observed that it would be reasonable for them to be thinking,

> I've got an armed suspect. He's agitated. He's made threats that there's going to be a bloodbath. He's already engaged in alleged aggravated assault. And

we're on alert. And so they, of course, are focusing first and foremost on public safety and their own safety. And . . . to some degree the safety of Mr. Jessop.

¶25 With respect to these considerations and the requirements under *Tiedemann*, the court found that there was no lost or destroyed evidence. The court then determined that, under the statute, the deputies' activation of their body cameras "at the completion of the shooting when there was no longer the threat . . . was reasonable" in consideration of officer and public safety. In that vein, the court determined that the deputies "did not act in bad faith" and "did not act unreasonably given the ever-changing circumstances and the evolution of facts that . . . came about as they were attempting to locate Mr. Jessop." Accordingly, the court denied the motion to dismiss.

¶26 The court later memorialized in writing its rulings from the bench denying Jessop's motions to suppress evidence and to dismiss charges. Jessop subsequently entered into a plea agreement with the State, in which he entered both a no-contest *Sery* plea[7] and an *Alford* plea[8] regarding the two charges of assault

---

7. As has been codified for many years in rule 11(j) of the Utah Rules of Criminal Procedure, "a *Sery* plea is a conditional plea in which a defendant pleads guilty (or no contest) but reserves the right to appeal the trial court's denial of a motion to suppress certain evidence. If the appellate court reverses the denial of that motion, the defendant's plea is withdrawn." *Kamoe v. Ridge*, 2021 UT 5, ¶ 23, 483 P.3d 720 (quotation simplified). *See State v. Sery*, 758 P.2d 935, 937–39 (Utah Ct. App. 1988).

8. An *Alford* plea

is a type of guilty plea in which a defendant does not expressly admit his guilt, but nonetheless

(continued…)

against a peace officer. He also pled guilty to all other charges not dismissed by the State as a part of the plea agreement.

ISSUES AND STANDARDS OF REVIEW

¶27    Jessop raises two issues on appeal. He first contends that the court erroneously denied his motion to dismiss the assault against a peace officer charges, arguing that his right to due process was violated because the State destroyed exculpatory evidence. "Whether the State's destruction of potentially exculpatory evidence violates due process is a question of law that we review for correctness, though we incorporate a clearly erroneous standard for the necessary subsidiary factual determinations." *State v. DeJesus*, 2017 UT 22, ¶ 18, 395 P.3d 111 (quotation simplified).

¶28    Jessop next contends that the court erroneously denied his motion to suppress, arguing that the detectives' questioning while he was in the hospital constituted a custodial interrogation requiring a *Miranda* warning. "We review the trial court's factual findings underlying the denial of a motion to suppress for clear error, while we review a trial court's ensuing conclusions of law for correctness." *State v. Maestas*, 2012 UT App 53, ¶ 16, 272 P.3d 769 (quotation simplified).

---

waives his right to a trial and authorizes the court for purposes of the case to treat him as if he were guilty. These pleas allow courts to impose a prison sentence upon an accused who is unwilling expressly to admit his guilt but who, faced with grim alternatives, is willing to waive his trial and accept the sentence.

*State v. Archuleta*, 2019 UT App 136, ¶ 5 n.2, 449 P.3d 223 (quotation simplified). *See North Carolina v. Alford*, 400 U.S. 25, 35-36 (1970).

ANALYSIS

I. Motion to Dismiss[9]

¶29 The district court denied Jessop's motion to dismiss, holding that our Supreme Court's decision in *State v. Tiedemann*, 2007 UT 49, 162 P.3d 1106, was inapplicable to this case. The court held that no video evidence of the police shooting had been destroyed and, accordingly, concluded that this was not a destruction of evidence case, stating, "If anything, it's a failure to preserve case, which *Tiedemann* doesn't actually speak to." Jessop argues that the court's conclusion that *Tiedemann* did not apply deprived him of due process.

¶30 The Utah Constitution provides that "[n]o person shall be deprived of life, liberty or property, without due process of law." Utah Const. art. I, § 7. In *Tiedemann*, our Supreme Court considered the due process right to protection against the State's loss or destruction of possibly exculpatory evidence. With the objective of providing an "adequate safeguard," our Supreme Court implemented the following two-part framework to deal

---

9. Jessop presents this purely as a constitutional due process issue rather than as a claim under the body-worn camera statute, which requires that officers "activate the body-worn camera prior to any law enforcement encounter, or as soon as reasonably possible." Utah Code Ann. § 77-7a-104(4) (LexisNexis Supp. 2022). Within the body camera statute, our Legislature has seen fit to include the provision that "[a] violation of [section 104] may not serve as the *sole* basis to dismiss a criminal case or charge." *Id.* § 77-7a-104(12) (emphasis added). Thus, while we do not reach the statutory question here, we think it unlikely that Jessop would have prevailed on appeal had he sought relief on the theory that the detectives violated the body-worn camera statute, given the "sole basis" language in the statute.

with cases where the State has lost or destroyed potentially exculpatory evidence:

> In cases where a defendant has shown a reasonable probability that *lost or destroyed* evidence would be exculpatory, we find it necessary to require consideration of the following: (1) the reason for the destruction or loss of the evidence, including the degree of negligence or culpability on the part of the State; and (2) the degree of prejudice to the defendant in light of the materiality and importance of the missing evidence in the context of the case as a whole, including the strength of the remaining evidence.

*Tiedemann*, 2007 UT 49, ¶ 44 (emphasis added). *See State v. DeJesus*, 2017 UT 22, ¶ 26, 395 P.3d 111. In this appeal, we must consider whether evidence that never came to exist qualifies as either "lost or destroyed." *See Tiedemann*, 2007 UT 49, ¶ 44.[10]

---

10. In *Arizona v. Youngblood*, 488 U.S. 51 (1988), the United States Supreme Court held "that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law" under the federal constitution. *Id.* at 58. Our Supreme Court's decision in *State v. Tiedemann*, 2007 UT 49, 162 P.3d 1106, departed from the test articulated in *Youngblood* because it was "both too broad and too narrow to serve as an adequate safeguard of the fundamental fairness required by article I, section 7 of the Utah Constitution." *Id.* ¶ 44 (quotation simplified). In departing from *Youngblood*, Utah joined many other states that have replaced a defendant's required demonstration of bad faith on the part of the police with a two-part "balancing process" based on "fundamental fairness." *Id.* ¶¶ 42, 45.

¶31    In *Tiedemann*, the defendant was "declared incompetent to stand trial" and "then civilly committed to the Utah State Hospital." *Id.* ¶ 7. Following standard procedure and with permission from the prosecutor, the State destroyed the majority of the physical evidence two years later based on its informed expectation that it was "unlikely" that the defendant would "ever be found competent to stand trial." *Id.* ¶¶ 7–8. But nearly ten years after committing the crime, the defendant was found competent to stand trial. *Id.* ¶ 10. The trial court later denied the defendant's motion "to dismiss the case due to destruction of evidence." *Id.* Our Supreme Court affirmed the decision based on its determination that "the reasons for the loss of the evidence are entirely routine and benign." *Id.* ¶ 46.

¶32    As the district court correctly noted in the current case, the circumstances here materially differ from the circumstances presented in *Tiedemann* because in that case there was no dispute that the evidence had existed or that the State had destroyed it. But in this case, video evidence from the deputies' body cameras prior to their post-shooting activation never actually existed. This presents us with the question of whether it can be said that the State "lost" or "destroyed" evidence that never came into existence.

¶33    We previously contemplated a similar issue in *State v. Powell*, 2020 UT App 63, 463 P.3d 705. In that case, the defendant argued on appeal that defense counsel "performed deficiently by not moving to dismiss the case due to the lost or destroyed video surveillance" evidence, *id.* ¶ 50, and we considered the defendant's entitlement to "information *possessed by the State*," *id.* ¶ 51 (emphasis in original) (quotation simplified). The case involved security camera footage from convenience stores, and the defendant focused on the stores' culpability and "the police's purported obligation to immediately make some attempt to preserve potential evidence upon receipt of a report." *Id.* In our decision, we cited *Tiedemann* for the proposition that "criminal

defendants are entitled to information *possessed by the State* to aid in their defense," *id.* (quoting *Tiedemann*, 2007 UT 49, ¶ 40) (emphasis in *Powell*), and held that the State was under no affirmative duty to protect evidence not in its possession, *id.* ¶¶ 51, 54–55. Because the defendant in that case was not able to show that the State ever had possession of the footage, we concluded that the defendant would not be able to demonstrate that "the State actually lost or destroyed the video footage." *Id.* ¶ 51. By logical extension of our reasoning in *Powell*, if the State is not responsible for preserving evidence that existed but that the State did not possess, can the State be liable for the loss or destruction of evidence that never even existed? We think not.

¶34 Jessop further relies on our decision in *Gordon v. State*, 2016 UT App 190, 382 P.3d 1063, *cert. denied*, 390 P.3d 726 (Utah 2017). In *Gordon*, the defendant argued "that his right to due process was violated when the police failed to collect or preserve . . . critical physical evidence from the crime scene." *Id.* ¶ 5 (quotation simplified). We held that the defendant "could have discovered and raised a due process claim in post-trial motions based on the State's failure to collect the" evidence. *Id.* ¶ 32. But this decision is readily distinguishable from the case at hand because the challenged evidence in *Gordon* actually existed, while here the evidence on which Jessop relies never did. Simply stated, evidence that never came into existence can neither be lost nor destroyed, and so such evidence is beyond the reach of the rule explained in *Tiedemann*.

¶35 For *Tiedemann* to have applied in this case, the deputies would have had to have activated their body cameras, generated the video footage that Jessop thinks would have been exculpatory, and then lost or destroyed that video footage. But none of that happened, so Jessop does not have a claim under *Tiedemann*. Based on the fact that the evidence simply did not exist, and given our determination that *Tiedemann* requires the loss or destruction

of evidence that had come into existence at some point, the district court correctly ruled that *Tiedemann* did not apply.

## II. Motion to Suppress Evidence

¶36 The district court denied Jessop's motion to suppress evidence gathered by the detectives during the hospital interview based on the court's ultimate finding that Jessop "was not 'in custody' for the purposes of *Miranda*" and the consequent conclusion that he "was not subject to custodial interrogation." On appeal, Jessop asserts that the district court's ruling was erroneous. He contends that the court's consideration regarding Jessop's hospitalization is distinguishable from our decision in *State v. Maestas*, 2012 UT App 53, 272 P.3d 769, and that "the district court left out many facts that led to the incorrect conclusion." Jessop identifies three factors unaddressed by the court. He first argues that the court "made no findings about how [he] was brought to the hospital." He then argues that the court made no findings about how Detective "showed up to the hospital to fill out involuntary commitment paperwork and actually did fill out that paperwork." And lastly, Jessop argues that the court did not make findings that Detective's disclosure to Jessop that he was not under arrest "was belied by the fact that [his] prior officer interactions involved the use of weapons and restraint, and had the deputies not severely wounded [him], [he] would have been arrested and taken to jail." Ultimately, though, Jessop asserts that "[d]espite statements from detectives that [he] was not under arrest, . . . a reasonable person would not believe he was free to terminate the encounter with the detectives and leave" because he "could neither speak nor leave the bed or equipment attached to him that was preserving his life."

¶37 Conversely, the State argues that the court properly denied Jessop's motion to suppress. The State contends that "even if Jessop could have reasonably believed that he was still in [police] custody while receiving medical care, that belief was undercut the

moment [Detective] explicitly informed him that he was not under arrest and he was not detained." Ultimately, the State contends, quoting *State v. Levin*, 2006 UT 50, 144 P.3d 1096, that "Jessop's 'freedom of action' was not 'curtailed' by police in any degree, and even if it could be said that it was, it was certainly not 'curtailed to a degree associated with formal arrest.'" *See id.* ¶ 35 (quoting *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984)). Based on all the relevant circumstances, we agree with the State that Jessop was not in police custody when he was questioned by the detectives.

¶38 Possibly because of its fundamental significance or possibly because of the entertainment media's fascination with criminal law, attorneys, and law enforcement, the recitation of *Miranda* warnings may be the most frequently quoted phrasing from American jurisprudence. *See Miranda v. Arizona*, 384 U.S. 436, 479 (1966). In *Miranda*, "the Court adopted a set of prophylactic measures to protect a suspect's Fifth Amendment right from the inherently compelling pressures of custodial interrogation," *Maryland v. Shatzer*, 559 U.S. 98, 103 (2010) (quotation simplified), by requiring that law enforcement inform a criminal suspect that "he has the right to remain silent, anything he says can be used against him in a court of law, he has the right to the presence of an attorney, and if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires," *State v. Fullerton*, 2018 UT 49, ¶ 18, 428 P.3d 1052 (quoting *Miranda*, 384 U.S. at 479) (internal quotation marks omitted). *Miranda* warnings are not required every time police ask someone questions. But due to their critical importance, "*Miranda* warnings must be given to a defendant subject to custodial interrogation." *State v. Ferry*, 2007 UT App 128, ¶ 12, 163 P.3d 647 (quotation simplified). Otherwise, "[w]here an individual is subject to custodial interrogation and not given *Miranda* warnings, any statement made by that individual is inadmissible at trial." *Maestas*, 2012 UT App 53, ¶ 48.

¶39    Generally, "custodial interrogation occurs where there is both (1) custody or other significant deprivation of a suspect's freedom and (2) interrogation." *Levin*, 2006 UT 50, ¶ 34. In this case, the State does not dispute that Detective "'interrogated' Jessop at the hospital." Therefore, we consider only whether the court erroneously found that Jessop was not in police custody for the purposes of *Miranda* when he was interrogated by Detective.

¶40    "[B]ecause *Miranda* is a matter of federal jurisprudence, our courts must be in lockstep with the United States Supreme Court on whether an individual is in custody for purposes of *Miranda*." *Fullerton*, 2018 UT 49, ¶ 3. For *Miranda* purposes, "'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 565 U.S. 499, 508–09 (2012). It "is not synonymous with supervision or control." *State v. Reigelsperger*, 2017 UT App 101, ¶ 43, 400 P.3d 1127, *cert. denied*, 409 P.3d 1048 (Utah 2017). Under federal *Miranda* jurisprudence, questions of a suspect's custody are to be analyzed using a two-step analysis. "The initial step is to ascertain whether, in light of the objective circumstances of the interrogation, a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." *Fullerton*, 2018 UT 49, ¶ 21 (quotation simplified).[11] *See Howes*, 565 U.S. at

11. In *State v. Fullerton*, 2018 UT 49, 428 P.3d 1052, our Supreme Court addressed Utah's prior reliance on the *Carner* factors for questions of police custody. *Id.* ¶¶ 19–26. *See Salt Lake City v. Carner*, 664 P.2d 1168, 1171 (Utah 1983) (stating that in determining whether a suspect was subject to custodial interrogation, a court must consider "(1) the site of interrogation; (2) whether the investigation focused on the accused; (3) whether objective indicia of arrest were present; and (4) the length and form of interrogation"). The Court determined that "[s]trict or sole reliance on the *Carner* factors is inconsistent with the totality of the circumstances analysis prescribed by federal law," and that

(continued…)

509. If the court finds that an individual's freedom of movement was not curtailed, then the person was not in custody for *Miranda* purposes and the court's analysis ends there. *See Fullerton*, 2018 UT 49, ¶ 36. Conversely, if the court does find that "an individual's freedom of movement was curtailed, the focus turns to whether the relevant environment present[ed] the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id.* ¶ 21 (quotation simplified).

¶41    "The first part of this inquiry—whether a reasonable person would have felt free to leave—is an objective one." *State v. Fredrick*, 2019 UT App 152, ¶ 30, 450 P.3d 1154, *cert. denied*, 458 P.3d 748 (Utah 2020). "In order to determine how a suspect would have gauged his freedom of movement, courts must examine all of the circumstances surrounding the interrogation." *Howes*, 565 U.S. at 509 (quotation simplified). "Relevant factors include," but

---

"[w]hile these four factors may, at times, be relevant in a custody analysis, misplaced reliance on these factors can be highly problematic, especially where such reliance leads to conflicts with controlling law." *Fullerton*, 2018 UT 49, ¶ 23. Therefore, in cases arising after our Supreme Court's adoption of the *Fullerton* two-step analysis, "[e]ach of the *Carner* factors should be considered when relevant, ignored when not, and given appropriate weight according to the circumstances." *Id.* As the Court explained,

> we consider the *Carner* factors, as well as any additional factors indicated by the [United States] Supreme Court, within the broader contextual picture. And when, as a background matter, a person is subject to extensive, state-imposed restrictions on freedom of movement, the custody analysis should address all of the features of the interrogation, including the manner in which the interrogation was conducted.

*Id.* ¶ 24 (quotation simplified).

are not limited to, "the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning." *Id.* (quotation simplified). But in conducting this inquiry, "the subjective views harbored by either the interrogating officers or the person being questioned are irrelevant." *Fullerton*, 2018 UT 49, ¶ 22 (quotation simplified). *See Levin*, 2006 UT 50, ¶ 35 ("A suspect may understand himself or herself to be in custody based either on physical evidence or on the nature of the officer's instructions and questions."); *Maestas*, 2012 UT App 53, ¶ 49 ("Whether this standard is met depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.") (quotation simplified).

¶42    We ultimately conclude that Jessop was not in *police* custody for the purposes of *Miranda* when he was interrogated by Detective in the ICU, although clearly his freedom of movement was curtailed by his serious injuries and the life-saving medical equipment to which he was attached. We first consider whether "a reasonable person would have felt he or she was not at liberty to terminate the interrogation." *Fullerton*, 2018 UT 49, ¶ 21 (quotation simplified). "The most obvious and effective means of demonstrating that a suspect has not been taken into custody or otherwise deprived of freedom of action is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will." *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990) (quotation simplified).

¶43    Here, before the detectives started to question Jessop, they asked, "Is it okay if we talk to you for a minute and get your side of the story?" Jessop could have declined the detectives' request, but instead he agreed, affirmatively consenting to speak with them. When Detective began the interview, Jessop initially asked whether he was under arrest. Detective responded by stating that

Jessop was neither under arrest nor being detained by police and, further, that Jessop was under no obligation to speak to them. Near the end of the interview, Detective testified that Jessop asked a similar question, "What am I charged with," to which Detective similarly responded, "Nothing yet, I say yet, though, because possibly." Given Detective's explanations that Jessop was neither under arrest nor charged with anything at that time and that Jessop was not under any obligation to speak with the detectives, a reasonable person in Jessop's position would feel at liberty to terminate the conversation. As such, given all the circumstances, the court's finding that Jessop was not in custody for *Miranda* purposes is sound. *See Fullerton*, 2018 UT 49, ¶ 21.

¶44　Cases considering the question of custody for *Miranda* purposes typically speak in terms of a person's liberty "to terminate the interrogation and leave." *See, e.g., Howes*, 565 U.S. at 509 (quotation simplified). And in the vast majority of such cases, the two rise and fall together. Examples of this include a person who was stopped on the street and asked questions without being arrested or restrained in any way, *see Salt Lake City v. Ray*, 2000 UT App 55, ¶ 11, 998 P.2d 274 ("As long as the person remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification.") (quotation simplified), and a person who comes to the police station voluntarily and is interviewed by the police, without being restrained or confined, *see Fullerton*, 2018 UT 49, ¶¶ 31–32, 36 (noting that a defendant's voluntary appearance at the police station, in conjunction with a general lack of restraint and repeated assurance that he was not under arrest and free to leave, weighed against a finding that he was subject to police custody).

¶45　But in some cases, a defendant's ability to terminate the interrogation is not synonymous with the defendant's ability to leave the premises. For example, when police interview someone

who is already incarcerated, the fact that the interviewee cannot leave the premises is not dispositive of whether the interviewee was detained for purposes of *Miranda*. *See Howes*, 565 U.S. at 515-16 (holding that the defendant was not in police custody even though he could not have expected to be able to "roam free" following his choice to end the interview"); *State v. Butt*, 2012 UT 34, ¶ 22, 284 P.3d 605 (holding that the defendant was not in police custody for *Miranda* purposes where his "liberty was not restrained beyond his usual status as a jail inmate, nor was he coerced in any way").

¶46     In this case, similar to instances of the police questioning an already incarcerated person, Jessop's abilities "to terminate the interrogation and leave," *Howes*, 565 U.S. at 509 (quotation simplified), did not rise and fall together. As indicated, it is clear that Jessop understood that he was free to terminate the conversation, and he was told that he was not under arrest, both by Detective and a nurse. Had he elected to terminate the interview at any time during its thirty-minute course, it is obvious that he would not have been able to simultaneously exit his hospital room and call an Uber but instead that his decision to terminate the interview would "merely have returned him to his usual environment," *id.* at 516, namely, confinement as a matter of medical necessity rather than at the direction of law enforcement. Similar to someone who is incarcerated prior to a police interrogation, Jessop's inability to leave the interrogation was not attributable to the police conducting an interview or indicative of coercion. Instead, his inability to leave was a function of his serious injuries and his associated hospital confinement. Put simply, his inability to leave was a result of his being subject to medical confinement rather than police restraint.

¶47     For this reason, our focus is directed at Jessop's awareness that he was free to end the interview whenever he pleased, even though he was not physically able to leave the hospital due to his significant    injuries    and    resulting    treatment    regimen.

Nevertheless, other factors, such as the open door to his ICU room, likewise contributed to his understanding that he was free to end the interview at any time. *See Fullerton*, 2018 UT 49, ¶ 31 (noting that even if the door is closed, a defendant's knowledge that it is not locked weighs against a finding of police custody). The open door is at odds with any suggestion that he was subject to police coercion, and throughout the interview, Jessop received ongoing medical attention for his injuries—nurses and other healthcare workers were constantly coming and going. Further, he was not restrained in any way by the police through the use of handcuffs, drawn guns, an officer stationed outside his room, or a locked door. On the contrary, Detective informed the hospital staff that Jessop was "not to be guarded whatsoever" and that he was "a free person." This reality was confirmed a few weeks later when Jessop was discharged from the hospital and left as any other patient would do.

¶48　We categorically reject Jessop's efforts to equate his gunshot wounds and subsequent life-saving medical treatment with a formal arrest and the ensuing restraint on a person's freedom of movement for purposes of *Miranda*. When the detectives arrived, Jessop had been out of surgery for somewhere around fifteen hours and, because of his injuries and treatment regimen, he was hooked to a feeding tube and undoubtedly any number of other medical apparatuses. But being physically restrained for "life-saving medical treatment" and by the corresponding medical devices can simply not be equated with police restraints that are so commonly the focus under *Miranda* and its progeny. Indicia of police custody—closed and locked doors, drawn weapons, guards, handcuffs, or other factors—are qualitatively different from the predictable indicia of a person's necessary medical treatment—medical tubes and hoses, an open door in a busy hospital, and the coming and going of medical personnel. Jessop does not persuasively argue otherwise.

¶49    Jessop's best argument is that an individual who has been shot by the police and is hospitalized as a direct result of the shooting is necessarily in police custody for the purposes of *Miranda* while in the hospital. Jessop argues that because the police shooting was the sole reason for his hospitalization, the court erred in separating the underlying circumstances from the medical restrictions that facilitated his interrogation by the police. In support of this argument that where an individual's hospitalization is the result of any police shooting, the circumstances call for a per se determination that the person is in police custody for the purposes of *Miranda*, he cites the United States Supreme Court's decision in *Tennessee v. Garner*, 471 U.S. 1 (1985). In *Garner*, as a means to apprehend and prevent the escape of a perceived home burglar, the police shot a suspect when he "began to climb over the fence" to elude capture. *Id.* at 4. The Court held that "there can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Id.* at 7.

¶50    We are not persuaded that *Garner* is sufficiently similar to the facts of our case. There, the police employed deadly force as an offensive action to apprehend the suspect and further prevent him from eluding capture; but here, the deputies' use of deadly force came as the result of a defensive reaction when they were confronted by a person who had earlier discharged multiple firearms in a residential neighborhood and was now wielding a firearm and pointing it at them in a public place. Because the police shooting here was not for the sole purpose of apprehending Jessop but instead for the primary purpose of ensuring personal and public safety, this case is readily distinguishable from *Garner*. Therefore, we reject Jessop's argument that every police shooting results in a per se determination of police custody.

¶51    Jessop also argues that this case is distinguishable from *State v. Maestas*, 2012 UT App 53, 272 P.3d 769, in which we stated that a defendant who was interviewed in a hospital emergency

room "was, in a sense, in medical, not police custody." *Id.* ¶ 51. Jessop contends that his case is distinguishable because the defendant in *Maestas* was brought to the hospital by civilian medical personnel following an automobile accident, *see id.* ¶ 5, as opposed to Jessop's being brought to the hospital by medical personnel, including a SWAT medic, after being shot by the police. But we are not persuaded that there is a sufficient basis to differentiate these two cases. Even though *Maestas* was decided using the *Carner* factors, *see supra* note 11, we would still reach the same conclusion under current *Miranda* jurisprudence. In fact, we view our decision in *Maestas* as being very similar to the case at hand because the defendant there was also restrained only by the hospital's imposition of medical devices and not by any restraint measures imposed by the police. In *Maestas*, we held that "we do not assume an individual is in custody for *Miranda* purposes when his confinement and isolation are the result of medical treatment and not police interrogation." 2012 UT App 53, ¶ 51. Here, Jessop was physically restrained only by his feeding tube and the other necessary medical apparatuses. While Jessop argues that the feeding tube is attributable to the police shooting and therefore constitutes police custody, as addressed above, we are not persuaded by Jessop's argument.

¶52 When considering these circumstances in their totality, we conclude that at the time of his hospital interview, Jessop was not restrained by the police, much less restrained in a manner akin to a formal arrest, and that a reasonable person in Jessop's position "would have felt free to terminate the interview." *Fullerton*, 2018 UT 49, ¶ 30. Based on the foregoing, we are not persuaded that Jessop was in police custody for the purposes of *Miranda*. Therefore, we conclude that the district court's ruling that Jessop was not in custody at the time of Detective's questioning was by no means erroneous.

CONCLUSION

¶53    The district court correctly held that *Tiedemann* did not apply in this case because the video evidence from the deputies' body cameras simply never existed. The police neither lost nor destroyed it. We also conclude that the court correctly determined that Jessop was not in police custody at the time of the detectives' interview in the hospital and he was therefore not entitled to *Miranda* warnings.

¶54    Affirmed.

———————