**2024 UT App 71**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
VICTOR MANUEL HERNANDEZ,
Appellant.

Opinion
No. 20210849-CA
Filed May 9, 2024

Fifth District Court, St. George Department
The Honorable Jeffrey C. Wilcox
No. 181501448

Nicolas D. Turner and K. Andrew Fitzgerald,
Attorneys for Appellant

Sean D. Reyes and Jonathan S. Bauer,
Attorneys for Appellee

JUDGE JOHN D. LUTHY authored this Opinion, in which
JUDGES RYAN D. TENNEY and AMY J. OLIVER concurred.

LUTHY, Judge:

¶1     Victor Manuel Hernandez was found guilty of the murder of Luwing Lopez. On appeal, Hernandez challenges the trial court's denial of his motion to suppress his confession to police, the court's refusal to give several requested jury instructions, and the court's determination that certain testimony was hearsay that did not qualify for admission under any of the exceptions to the rule against hearsay. The State responds that each alleged error was either harmless or not an error at all. We agree with the State and affirm.

BACKGROUND

¶2    In June 2018, Hernandez had recently moved in with his sister (Sister) after having lived for a time with his friend, Lopez. One evening around 5:00 p.m., Lopez picked up Hernandez from Sister's home, and the two left.

¶3    Approximately two hours after leaving, Hernandez called Sister and asked her to come pick him up because he and Lopez had gotten into an argument. When Sister arrived to pick up Hernandez, she observed "that he was afraid." She noticed that he was not wearing the black shirt, jeans, and black shoes that he had been wearing when he left her house but was now barefoot and wearing shorts but no shirt. She also noticed "a little bit" of blood on him and thought that "maybe there were some blows" in the argument with Lopez. She repeatedly questioned Hernandez as to what had happened, but aside from telling her that the argument with Lopez dealt with a Santa Muerte "game" he and Lopez played,[1] Hernandez did not disclose more to Sister, and her repeated questioning ultimately made him upset with her.

¶4    Sister called her other brother (Brother), told him what was going on, and then said she was bringing Hernandez to Brother's home. After they arrived at Brother's home, Brother came outside to talk with Hernandez, who Brother described as "[n]ervous, afraid, [and] crying." Hernandez told Brother that he "had a problem." Hernandez also gave Brother a black backpack and asked him to throw it away. Brother did as requested, placing the backpack inside a white garbage bag

---

1. "Santa Muerte, [or Holy Death,] is a Mexican folk saint who personifies death. . . . [S]he is most often depicted as a female Grim Reaper, wielding the same scythe and wearing a shroud similar to her European male counterpart." R. Andrew Chesnut, *Devoted to Death: Santa Muerte, The Skeleton Saint* 3 (2d ed. 2018).

and throwing it into a nearby dumpster. Hernandez remained outside Brother's house crying in the vehicle for several hours and eventually disclosed to Brother that he had been in a fight and that he had hurt the other person in the fight.

¶5     Brother took Hernandez to a hotel to stay for the night. Brother also called the police and told them that Hernandez had fought with someone and "that the guy was in bad shape." Brother suspected that the man Hernandez had fought with was the man Hernandez had previously lived with—because that man "was the only person that [Hernandez] would . . . go out with" and because Hernandez "always had problems with him"—although Brother did not know Lopez by name. Brother showed the police Lopez's home, where Hernandez had previously lived, thinking that was where the altercation likely took place. Brother did not tell the police about Hernandez's backpack in the dumpster.

¶6     The following morning, Brother again spoke with Hernandez, and Hernandez disclosed that he had stabbed someone. Brother responded that he could not help Hernandez, and Hernandez asked Brother to call the police. Brother again called the police, and when they arrived, Brother told them about the backpack in the dumpster and showed them where it was. Officers retrieved and opened the backpack and found "a black shirt that was inside out," a pair of jeans "that were saturated in blood," and a knife with blood on it. Inside the jeans, the officers discovered a pill bottle with Lopez's name on it.

¶7     Officers took Hernandez to the police station and put him in an interview room. Two officers were present for the questioning of Hernandez. After gathering some basic personal information from Hernandez, the officers advised him of his

*Miranda* rights.[2] Hernandez said that he wanted to talk with the officers and "was willing to go forward without counsel or an attorney present." At that point, the investigation at Lopez's home had led to the discovery of Lopez's deceased body, but the body had not yet been identified. Because the officers knew "the murder had happened the previous day sometime," they began to question Hernandez as to his whereabouts over the last two days. Initially, Hernandez claimed that he had been at Sister's home the entirety of the prior day. But he also told the officers that if they talked to his family, his family members might say something about him killing someone, yet he asserted that he had not done so. Then, after about twenty-five minutes of questioning, the officers left the room "to gather more information from the detectives at the scene."

¶8 Officers took a "significant break" in questioning while the investigation proceeded. During this break, which lasted approximately five hours, Hernandez was kept in the interview room, and officers "bought him food, gave him drink, [gave him] a bathroom break, [and] made him comfortable." And at least once during this period, an officer checked in on Hernandez, asking him "if everything was okay," telling him that they were "still trying to figure out all the evidence," and "answer[ing] any of his questions as far as that goes." During the break, the police were able to identify the decedent as Lopez.

¶9 The officers then conducted two more periods of questioning, which were divided by a forty-five-minute break.

---

2. In *Miranda v. Arizona*, 384 U.S. 436 (1966), "the United States Supreme Court articulated a prophylactic rule that protects a suspect's Fifth Amendment rights against compelled self-incrimination and requires that suspects be informed of their right to remain silent and their right to counsel before a custodial interrogation begins." *State v. Gardner*, 2018 UT App 126, ¶ 15, 428 P.3d 58 (cleaned up).

When the officers returned to the interview room after the five-hour break, they brought a picture of Lopez and asked Hernandez if he knew that individual. Hernandez responded affirmatively and "changed his story and admitted that he was at [Lopez's] house the previous day at around 5:30 in the afternoon." The officers then showed Hernandez "a picture of the backpack that the bloody clothes and the knife were located in," and Hernandez identified the backpack as his. Officers then showed Hernandez pictures of some of the backpack's contents, including the bloody jeans, and Hernandez "admit[ted] that the jeans were his." The officers told Hernandez that they "needed to know what happened," and Hernandez responded that he "did it all." He described in detail the events of that evening, explaining that Lopez came to pick him up so they could "go to [Lopez's] house and smoke," that Hernandez has "a sixth sense that allows him to speak to spirits" and "that the spirits in his head told him that [Lopez] was going to sacrifice [Hernandez's] newborn son," and that Hernandez had brought a knife with him and used that knife to stab Lopez multiple times. Hernandez was arrested and charged with murder.

¶10 Early in the litigation of the case, Hernandez filed a motion to suppress all incriminating statements he had made during the later questioning by officers, arguing that when the officers had returned to question him after each break, he "was not read his *Miranda* rights and the officer conducting the interview did not make any reference to *Miranda* rights allegedly read at the first interview." The trial court denied the motion, stating:

> [T]he court does not find that [Hernandez's] circumstances during the period of interrogation had changed, other than the passage of time. [He] was the prime suspect from the beginning and the focus remained on him throughout the interrogation. . . . There is no evidence presented that [Hernandez's] answers were no longer

voluntary [during the later questioning] or [that] he was no longer relinquishing his rights under *Miranda*.

¶11 The case proceeded to trial. As part of the State's case, Sister, Brother, and police officers involved in the investigation testified to the facts set forth above. On cross-examination of Sister and Brother, the defense tried to elicit further information related to what Hernandez had told them regarding the Santa Muerte "game" and his related fear of Lopez, but such testimony was met by hearsay objections by the State, which objections the trial court sustained.

¶12 In response to the objections to Brother's proposed testimony, the defense, outside the presence of the jury, proffered what Brother's testimony would be if he was allowed to testify further. Brother would testify that during the prior month, Hernandez had told Brother that he "hadn't slept in days," that "[h]e was taking drugs to be able to stay awake because he was afraid that [Lopez] would kill him in his sleep," and that this was related to the Santa Muerte "game" that Hernandez and Lopez were involved in. Brother would testify that Hernandez had expressed that "because of that fear[,] . . . he was wanting to change his life and get out of that death game." The defense proffered that Brother would also testify that Hernandez had told him the following regarding the death "game":

> [T]hey would have a death saint or angel that they could ask certain favors from . . . . And that the entity would grant them special gifts or powers: better employment, better relationships, romantic relationships, but they always wanted something in exchange, whether it be fruit, or an item of clothing.
>
> And then at some point, . . . Lopez, who was practicing the same death game, was saying he was

going to kill [Hernandez's] very small infant as an offering to his particular death saint.

The court ultimately sustained the hearsay objections to this testimony, rejecting defense arguments that the testimony fell under the hearsay exceptions of present sense impression, excited utterance, and then-existing mental, emotional, or physical condition.

¶13 After Sister, Brother, and the police officers had testified, the State turned to its presentation of the forensic evidence. The State presented the testimony of the medical examiner who conducted the postmortem exam on Lopez's body. The medical examiner explained that "Lopez had obvious traumatic injuries"; that he had eight stab wounds on his head, neck, and torso; that "[p]retty much every wound was not survivable"; and that the knife found in the black backpack was "consistent with" the type of object that caused those injuries. The medical examiner then detailed the stab wounds. The medical examiner also described a defensive wound on Lopez's thumb, explaining, "There was an incised wound at the base of the left thumb . . . which we typically see in cases where the person is still trying to defend themselves."

¶14 The State also presented the testimony of the forensic scientist and DNA analyst who conducted the testing on items recovered in the black backpack, specifically the black shirt and the knife. She testified that the blood stains on the black shirt resulted in a DNA profile that "was consistent with a mixture of two individuals." She testified that "[a] major profile was determined at 17 [out of 21 DNA] locations that is consistent with [Lopez]." As to the blood on the knife, the analyst was "able to match at all 21 [DNA] locations" to Lopez's DNA profile.

¶15 The State thereafter rested, and the defense presented its case. The defense called Hernandez's godmother and godfather to testify. His godmother testified that during the month

preceding the alleged crime, she had noticed that Hernandez was "very fearful" and "very thin" and that "[h]is appearance was like, he was just close to death." She then related that she had asked Hernandez what was wrong, which prompted another hearsay objection by the State. The godmother proffered her testimony outside the presence of the jury, indicating that Hernandez had told her that he was afraid that Lopez was going to kill him, that he kept referencing a "man here that's taking care of me," and that he told her of the Santa Muerte "game" going on between himself and Lopez, in which they would do "ritual offerings." The godmother then related other experiences concerning Hernandez's involvement with the Santa Muerte "game" during the months leading up to the murder. The court ultimately ruled that the proffered testimony was hearsay that did not fit under any hearsay exception and that it would not be admitted.

¶16 The State likewise objected to the defense's attempted presentation of Hernandez's godfather's testimony, which testimony primarily concerned Hernandez's worshiping of Santa Muerte. The court again determined that the statements were hearsay and would not be admitted.

¶17 After the defense rested its case, the court discussed proposed jury instructions with the attorneys. The defense asked that the jury be instructed regarding the affirmative defenses of self-defense and defense of others. This request was based on testimony indicating that Hernandez was afraid of Lopez and on Hernandez's expressed fear that "Lopez was going to kill his child." The trial court denied the request, determining, "[W]hat [Hernandez] did was too soon. It was a pre-emptive strike. It was a vigilante-type action in case, to try and protect his son who was not there. There was no emergency."

¶18 The defense additionally requested an instruction on the lesser included offense of manslaughter, arguing that imperfect

legal justification merited such an instruction. That is, the defense argued that even if Hernandez's actions were "not legal or justifiable," a reasonable person in his shoes may have thought they were. The trial court determined that such an instruction was not supported by the evidence because even if Hernandez had been fearful of Lopez and thought that Lopez wanted to kill his son, "[h]e never . . . accuse[d] [Lopez] of trying to kill his son at that time," so a reasonable person would not have thought killing Lopez at that time was justifiable.

¶19   Finally, the defense requested an instruction on manslaughter based on a special mitigation for mental illness, arguing that Hernandez had "act[ed] under a delusion attributable to a mental illness." (Quoting Utah Code § 76-5-205.5 (2018).) The trial court declined to give the requested instruction, reasoning that because there had been "no evidence whatsoever presented" as to a mental illness, "the special mitigation for mental illness . . . cannot be argued."

¶20   The jury instructions were then read to the jury, closing arguments were presented, and the jury began its deliberations. Thereafter, the jury found Hernandez guilty of murder. Hernandez now appeals.

ISSUES AND STANDARDS OF REVIEW

¶21   Hernandez asserts that the trial court erred in denying his motion to suppress. "A trial court's ruling on a motion to suppress is reviewed for correctness, including its application of the law to the facts. The trial court's underlying factual findings are reviewed under the clearly erroneous standard." *State v. Tripp*, 2010 UT 9, ¶ 23, 227 P.3d 1251 (citation omitted).

¶22   Hernandez also challenges the trial court's refusal to give the requested affirmative defense instructions as well as a special

mitigation instruction to the jury. "The refusal to give a jury instruction is reviewed for abuse of discretion. . . . On issues that are primarily or entirely factual, we afford significant deference; on issues that are primarily or entirely legal in nature, we afford little or no deference." *State v. Berriel*, 2013 UT 19, ¶ 8, 299 P.3d 1133 (cleaned up). The specific issue here "of whether the record evidence, viewed in its totality, supports the defendant's theory of the case is primarily a factual question," entitled to a large degree of deference. *Id.* ¶ 9.

¶23 As an alternative argument related to the special mitigation instruction, Hernandez argues that he received ineffective assistance of counsel when his attorney failed to present additional evidence of Hernandez's mental health. "Ineffective assistance of counsel claims raised for the first time on appeal are issues of law that we review for correctness." *State v. Sessions*, 2012 UT App 273, ¶ 11, 287 P.3d 497, *aff'd*, 2014 UT 44, 342 P.3d 738.

¶24 Lastly, Hernandez argues that the trial court erred in disallowing certain testimony under the rule against hearsay.

> Our standard of review on the admissibility of hearsay evidence often contains a number of rulings, each of which may require a different standard of review. We review the legal questions to make the determination of admissibility for correctness. We review the questions of fact for clear error. Finally, we review the district court's ruling on admissibility for abuse of discretion.

*Arnold v. Grigsby*, 2018 UT 14, ¶ 21, 417 P.3d 606 (cleaned up).

¶25 Even if there is error on the part of the trial court, "an error is harmless and does not require reversal if it is sufficiently inconsequential that we conclude there is no reasonable

likelihood that the error affected the outcome of the proceedings." *State v. Reece*, 2015 UT 45, ¶ 33, 349 P.3d 712 (cleaned up). In other words, "the likelihood of a different outcome absent the error must be sufficiently high to undermine confidence in the verdict." *Id.* (cleaned up). "And the defendant generally bears the burden to demonstrate that the error . . . affected the outcome of [the] case." *Id.* However, when addressing claims involving the "violation of a federally protected constitutional right," federal law sets a higher plain error standard and instructs that "we cannot declare federal constitutional error harmless unless we sincerely believe that it was harmless beyond a reasonable doubt." *State v. Genovesi*, 909 P.2d 916, 922 (Utah Ct. App. 1995) (cleaned up).

## ANALYSIS

### I. Motion to Suppress

¶26    Hernandez first challenges the trial court's denial of his motion to suppress evidence obtained during questioning at the police station. *See generally Miranda v. Arizona*, 384 U.S. 436, 444 (1966) ("[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."). He argues that the officers who questioned him violated his Fifth Amendment rights by failing to read the *Miranda* warnings to him at any point after the five-hour break in questioning. He characterizes the first round of questioning as "brief" and "informational only" and contends that the questioning "morphed" from an interview into an interrogation during the five-hour break. He asserts that the "[l]engthy incommunicado detention" combined with "the changed circumstances between the first and second interrogation" required additional readings of his *Miranda* rights.

¶27    The State, on the other hand, argues that "Hernandez's interviews were a murder interrogation from the beginning" and that the "'mere passage of time'" did not require further *Miranda* warnings. (Quoting *Mitchell v. Gibson*, 262 F.3d 1036, 1057 (10th Cir. 2001).) Additionally, the State argues that even assuming error in the trial court's denial of Hernandez's motion to suppress, any such error "was harmless beyond a reasonable doubt in light of the other overwhelming evidence that Hernandez murdered Lopez."

¶28    We agree with the State that any error in the denial of the motion to suppress was harmless beyond a reasonable doubt. "[A]n otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." *State v. Maestas*, 2012 UT 46, ¶ 56, 299 P.3d 892 (alteration in original) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986)). "Several factors are relevant to our determination of whether an error in admitting evidence was harmless beyond a reasonable doubt, including the importance of the evidence to the prosecution's case, whether the evidence was cumulative, and, of course, the overall strength of the prosecution's case." *State v. Genovesi*, 909 P.2d 916, 923 (Utah Ct. App. 1995). Here, the strength of the other evidence presented by the State lessened the importance to the State's case of the allegedly improperly admitted statements to such an extent that we are convinced that any error in admitting the statements was harmless beyond a reasonable doubt.

¶29    First, there was the evidence regarding the black backpack. Brother testified that after Sister brought Hernandez over to Brother's home, Hernandez told Brother that he "had a problem" and gave Brother the backpack, instructing him to throw it away. And the jury was shown evidence that the contents of that backpack included bloody clothes, a knife with blood on it, and a pill bottle with Lopez's name on it. The bloody clothes matched

Sister's description of what Hernandez had been wearing earlier, which included a black shirt, jeans, and black shoes.

¶30  Second, there was the evidence of Hernandez's other incriminating statements. Brother testified that on the evening of the murder, Hernandez disclosed, sometime during his hours of crying, that he had fought with someone and that the person he had fought with had been hurt. Brother also testified that the following morning, Hernandez specified that he had stabbed someone. Additionally, when first questioned by police, Hernandez warned police that if they talked to his family, his family members "may say something about him saying that he killed someone."

¶31  Third, there was the forensic evidence. The State conducted testing on the blood on the black shirt and the knife retrieved from the backpack, and that testing showed matches between the DNA profiles of the tested blood and Lopez's DNA profile. Additionally, evidence was presented by the medical examiner as to the eight stab wounds on Lopez's head, neck, and torso. The medical examiner testified that the stab wounds were consistent with the type of knife recovered from the backpack. And he testified regarding the severity of each wound—that "[p]retty much every wound was not survivable." He also testified to "an incised wound at the base of [Lopez's] left thumb," which medical examiners "typically see in cases where the person is still trying to defend themselves."

¶32  This evidence overwhelmingly establishes Hernandez's guilt, showing that Hernandez repeatedly stabbed Lopez and intentionally caused his death. Considering these facts, we are convinced that any error in the denial of Hernandez's motion to suppress was harmless beyond a reasonable doubt. That is, we are convinced beyond a reasonable doubt that had the trial court suppressed Hernandez's incriminating statements made

following the five-hour break in questioning, the jury would have still convicted Hernandez of murdering Lopez.

## II. Jury Instructions

¶33    Hernandez also challenges the trial court's refusal to instruct the jury on self-defense, defense of others, and a special mitigation for mental illness. Hernandez argues that these instructions were warranted based on his "delusions" and his belief "that he and his child were in danger from Lopez and that, under his present state-of-mind, he had no choice but to protect his family."

¶34    "A defendant is entitled to have the jury instructed on the defense's theory of the case if there is any basis in the evidence to support that theory." *State v. Berriel*, 2013 UT 19, ¶ 12, 299 P.3d 1133 (cleaned up). The trial court determined that there was no such basis in the evidence here, and we see no abuse of discretion in this determination.

A.    Perfect Self-Defense, Imperfect Self-Defense, and Defense of Others

¶35    The Utah Code excludes criminal responsibility for actions taken in perfect self-defense or defense of others: "An individual is justified in threatening or using force against another individual when and to the extent that the individual reasonably believes that force or a threat of force is necessary to defend the individual or another individual against the imminent use of unlawful force." Utah Code § 76-2-402(2)(a).[3] Additionally, our murder

---

3. The several statutes relevant to our analysis regarding the proposed jury instructions have been amended since the events giving rise to this case. We cite the current versions of those statutes whenever the alterations to the relevant language have been slight and do not impact our analysis.

statute includes the following provision addressing imperfect self-defense or defense of others: "It is an affirmative defense to a charge of murder . . . that the defendant caused the death of another individual . . . under a reasonable belief that the circumstances provided a legal justification or excuse for the conduct although the conduct was not legally justifiable or excusable under the existing circumstances." *Id.* § 76-5-203(4)(a). Imperfect self-defense can reduce a charge from murder to manslaughter. *Id.* § 76-5-203(4)(c).

¶36 "For both perfect and imperfect self-defense, the same basic facts are at issue." *State v. Silva*, 2019 UT 36, ¶ 26, 456 P.3d 718 (cleaned up). The only difference between the two is whether "the use of deadly force was legally justifiable under the circumstances" or whether the defendant mistakenly, but reasonably, concluded it was. *Id.* But both defenses "require the defendant to present the same evidence: that the defendant had a reasonable belief that force was necessary to defend himself [or another]" against imminent unlawful force. *Id.* (cleaned up). And it is this requirement that Hernandez failed to meet.

¶37 When considering whether there is evidence that Hernandez reasonably believed force was necessary to defend himself or his son, we do so "from the viewpoint of a reasonable person under the then existing circumstances." Utah Code § 76-5-203(4)(b). And even if we do as Hernandez urges and credit his great fear of Lopez as well as his delusions regarding the danger to his infant son, there is no evidence that a reasonable person who is nevertheless suffering under these fears or delusions would reasonably believe that force was necessary to defend against *imminent* harm. There was no evidence of any present threat to Hernandez on the night of the murder. Additionally, because there was no evidence that Hernandez's infant son was with him or Lopez the night of the murder, there was likewise no risk of imminent harm to Hernandez's son from Lopez. Any fear of harm from Lopez must necessarily have related entirely to

future—as opposed to imminent—harm. We therefore see no abuse of discretion in the trial court's refusal to instruct the jury on perfect self-defense, imperfect self-defense, or defense of others.

**B.     Special Mitigation for Mental Illness**

¶38     Hernandez also requested a jury instruction addressing special mitigation based on mental illness, which would have likewise reduced the murder charge to a manslaughter charge, *see* Utah Code § 76-5-205(2) (2018). The relevant statute declared:

> Special mitigation exists when the actor causes the death of another or attempts to cause the death of another:
>
> (a)(i)  under circumstances that are not legally justified, but the actor acts under a delusion attributable to a mental illness as defined in Section 76-2-305;
>
>     (ii)  the nature of the delusion is such that, if the facts existed as the defendant believed them to be in the delusional state, those facts would provide a legal justification for the defendant's conduct; and
>
>     (iii) the defendant's actions, in light of the delusion, were reasonable from the objective viewpoint of a reasonable person . . . .

*Id.* § 76-5-205.5(1). The definition of "mental illness" incorporated by reference at the time of the offense in this case was as follows: "'Mental illness' means a mental disease or defect that substantially impairs a person's mental, emotional, or behavioral functioning. A mental defect may be a congenital condition, the result of injury, or a residual effect of a physical or mental disease

and includes, but is not limited to, intellectual disability." *Id.* § 76-2-305(4)(b)(i).[4]

¶39  Hernandez argues that testimony below provided substantial evidence that he suffered from delusions that were attributable to a mental illness. He thus contends that the trial court abused its discretion by declining to give a jury instruction on special mitigation based on mental illness. The State, on the other hand, defends the trial court's determination that Hernandez presented "no evidence whatsoever" supporting the existence of a mental illness. Ultimately, we need not decide whether Hernandez put on adequate evidence of a delusion attributable to a mental illness.

¶40  To merit a jury instruction on special mitigation based on mental illness, Hernandez was required to put on evidence of more than a delusion attributable to a mental illness. He was also required to put on evidence that "the nature of the delusion [was] such that, if the facts existed as [Hernandez] believed them to be

---

4. The current version of the special mitigation statute refers not to a "mental illness" but to a "mental condition," Utah Code § 76-5-205.5(2)(a)(i), which is statutorily defined as "a mental illness or a mental disability that substantially impairs an individual's mental, emotional, or behavioral functioning," *id.* § 76-2-305(1)(a)(i). The current code then defines "mental disability" as "an intellectual disability or a neurodevelopmental disorder as those terms are defined in the current edition of the Diagnostic and Statistical Manual of Mental Disorders published by the American Psychiatric Association," *id.* § 76-2-305(1)(b), and "mental illness" as "the following mental disorders as described in the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders published by the American Psychiatric Association: (i) schizophrenia spectrum and other psychotic disorders; or (ii) other serious mental health conditions with psychotic features," *id.* § 76-2-305(1)(c).

in the delusional state, those facts would provide a legal justification for [Hernandez's] conduct." *Id.* § 76-5-205.5(1)(a)(ii). And as the trial court pointed out, there was no evidence suggesting that any delusions under which Hernandez may have been suffering mistakenly gave him the impression that he or his son were in *imminent* danger of being harmed by Lopez. The delusions as described related only to future anticipated harm. Thus, even if Hernandez put on substantial evidence that he had delusions attributable to a mental illness, he did not show that those delusions, if real, would have provided legal justification for his actions against Lopez. Accordingly, the court did not abuse its discretion by declining to instruct the jury on special mitigation.

### III. Ineffective Assistance of Counsel

¶41    Related to the asserted lack of evidence supporting the existence of a mental illness as the cause of his delusions, Hernandez argues that his counsel was ineffective for failing to present more evidence related to his mental health. "To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) that counsel's performance was deficient, and (2) that the deficient performance prejudiced the defense." *State v. Calvert*, 2017 UT App 212, ¶ 21, 407 P.3d 1098 (cleaned up).

¶42    Hernandez contends that his counsel "had an obligation to fully investigate Hernandez's mental health issues" and that the "failure to investigate prejudiced Hernandez because this information would have explained why Hernandez acted the way he did and took the action he did." However, Hernandez's ineffective assistance claim suffers from the same problem that his jury instruction claims do: even if he proved that he suffered from delusions attributable to a mental illness, this would benefit him only if he could prevail under a theory of self-defense, defense of others, or special mitigation. And as explained above, Hernandez provided no evidence that any of his delusions gave him the impression that he or his son were in *imminent* danger of being

harmed by Lopez, so he would not have prevailed on any of those theories. Thus, Hernandez's counsel did not perform deficiently by not presenting more evidence regarding Hernandez's mental health, and Hernandez's ineffective assistance argument fails.

## IV. Hearsay Statements

¶43　Finally, Hernandez argues that the trial court erred by excluding certain witness testimony as hearsay. *See generally* Utah R. Evid. 801(c) ("'Hearsay' means a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."); *id.* R. 802 ("Hearsay is not admissible except as provided by law or by these rules."). Hernandez asserts that the evidence fell under several exceptions to the hearsay rule and should therefore have been admitted. *See generally id.* R. 803(1)–(3) (providing that present sense impressions, excited utterances, and then-existing mental, emotional, or physical conditions "are not excluded by the rule against hearsay").

¶44　We do not reach Hernandez's arguments regarding the admissibility of the evidence at issue because we determine that any abuse of discretion by the trial court in excluding the evidence was clearly harmless. Each statement that Hernandez wanted to present to the jury was related to his fear of Lopez or his related involvement with the Santa Muerte "game." And as we have explained in Part II, there was no basis in the evidence—even had these hearsay statements been admitted—to support instructing the jury on the requested affirmative defenses or special mitigation because none of the evidence presented (or proffered) suggested that a person in Hernandez's position on the night Lopez was murdered would have had any fear of *imminent* harm to himself or his child. Therefore, any abuse of discretion on the part of the trial court in relation to its hearsay determinations was harmless and does not merit reversal.

CONCLUSION

¶45    Any error or abuse of discretion the trial court may have committed in denying Hernandez's motion to suppress or excluding witness testimony under the hearsay rule was harmless. And the trial court did not abuse its discretion in refusing to give instructions on affirmative defenses and special mitigation for which there was no support in the evidence. Nor has Hernandez shown that his counsel provided ineffective assistance in failing to investigate or present evidence of alleged mental illness. We therefore affirm.

———————