2025 UT App 4

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
ROYCE BRANDON SCHAEFER,
Appellant.

Opinion
No. 20210247-CA
Filed January 9, 2025

Fourth District Court, Provo Department
The Honorable Thomas Low
No. 161403069

Douglas J. Thompson, Attorney for Appellant

Derek E. Brown and Jonathan S. Bauer,
Attorneys for Appellee

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and RYAN M. HARRIS
concurred.

ORME, Judge:

¶1      Royce Brandon Schaefer appeals his convictions of sodomy upon a child and aggravated sexual abuse of a child. He argues that the trial court erroneously concluded he was not in custody for *Miranda* purposes during a police interrogation and that the court accordingly erred in denying his motion to suppress an incriminating statement he made during the interrogation. Because we conclude Schaefer was in custody at the point in the interrogation when he requested an attorney, we reverse.

BACKGROUND

¶2    Four-year-old B.D.[1] was eating lunch outside the apartment she shared with her mother (Mother) when an unknown man sat next to her and put his mouth on her vagina, biting it "hard." B.D., crying, told Mother that "someone's dad" "bit [her] peepee." Mother called the police. After giving the responding officer (Officer) a "very vague description" of the man as "someone's dad who wore glasses," Mother took B.D. to the hospital, where cheek and genital swabs, as well as B.D.'s clothes, were collected for testing. B.D. was later interviewed at the Children's Justice Center. She described the man who touched her as wearing glasses, a blue shirt, and blue pants. She disclosed that the man had flipped her onto her stomach and "bit [her] peepee"—indicating her vagina. She also stated that he had inserted his finger into her vagina.

¶3    Meanwhile, Officer canvassed the apartment complex looking for someone fitting the description Mother gave him. He spoke to a neighbor (Neighbor) who had twice seen a man drive slowly through the complex in an older two-door maroon car. Neighbor described the man as a "White male, late twenties, early thirties" with "short, blonde hair" and wearing denim jeans and a plaid shirt with a white base and blue or green striping. Neighbor had also seen the driver walk past her on the sidewalk and later saw him run through the complex and jump over a nearby fence.

¶4    Two days after the incident, Neighbor and her friend met at a nearby park, and Neighbor informed police that there was a car parked there matching the description of the one she had seen at the apartment complex on the day of the incident. Hearing this

---

1. To protect her identity, we refer to B.D. by her initials. *See* Utah R. App. P. 24(d) ("The identity of minors should be protected by use of descriptive terms, initials, or pseudonyms.").

call over the radio, Officer arrived at the park to see an "older model, really deep maroon/brown-colored vehicle" and the driver—a white male with "[b]londish hair." Neighbor told Officer that the vehicle was the same one she had seen at the apartment complex and that the driver was the man she had seen jump the fence. Police identified the driver as Schaefer.

¶5     Because there was not enough evidence to arrest him at the park, Schaefer was allowed to leave. But the detective assigned to the case (Detective) later obtained a warrant for Schaefer's DNA. Detective served the warrant at Schaefer's home, giving Schaefer a copy to read and informing him that the DNA collection would occur at the police station. Detective accompanied Schaefer to his bedroom while Schaefer got dressed. Inside the room, Detective observed eyeglasses and a blue and white plaid shirt. Although Schaefer consented to go to the police station pursuant to the warrant, because Detective's vehicle did not "have any safety cage" or other means to separate Schaefer from Detective, Detective placed him in handcuffs and a "waist belt that straps around the waist" and "allows the hands to be secured in front."

¶6     At the station, Schaefer—still wearing the waist belt and handcuffs—was escorted into a small interview room. Two armed officers entered the room to take Schaefer's blood and saliva samples, as well as photos of him. The handcuffs were removed from Schaefer's wrists to facilitate the blood draw, but they were left attached to the waist belt and rested in his lap. When the officers finished, they exited the room, closing the door behind them.

¶7     After Schaefer's DNA was collected, Detective, also armed, entered the room and asked Schaefer, "Did you want me to answer any questions or anything for you?" When Schaefer indicated he did have questions, Detective said, "Clearly you're the subject of an investigation, so I'd like to give you the Miranda warning, and then after that you can ask me whatever you want,

okay?" After reading Schaefer his rights, Detective asked whether he understood them, to which Schaefer answered, "Yeah. I think I will—I will need a lawyer," clarifying, "Because apparently you guys got me on a search warrant and stuff, and it seems really serious, and from what I've read, I'm going to be needing—". Instead of ending it there, Detective continued the interview, again asking Schaefer if he had any questions. Schaefer asked, "Am I free to go back home, then; is that what you're saying?" Detective said, "I'll take you home if you don't want to ask me any questions or anything about the investigation." But Detective then continued speaking, describing the investigation and eventually obtaining Schaefer's admission that he had been "looking around that area for . . . apartments" and had driven by the apartment complex on the day in question. At the end of the interview, Detective put the handcuffs back on Schaefer and took him home.

¶8 After forensic results showed the presence of a small amount of DNA from male saliva on the underwear B.D. had been wearing on the day of the incident, Schaefer was charged with one count of sodomy upon a child and one count of aggravated sexual abuse of a child, both first-degree felonies.[2]

¶9 Before trial, Schaefer filed a motion to suppress the recording of his interview with Detective, arguing that "[a]ll objective indicia of arrest were present at the time of questioning" and that Schaefer had made an "unequivocal assertion of his right to counsel." After an evidentiary hearing, the trial court issued an order in which it found that the interview occurred immediately after executing the DNA warrant; Detective "made no coercive or manipulative statements"; the entire encounter—including DNA sample collection—lasted one hour; and although Schaefer

---

2. The amount of male DNA extracted from the underwear was insufficient to allow for further testing to identify the source of the DNA.

remained in the waist belt, he was not handcuffed. The court also noted that Schaefer "was explicitly told he was not under arrest and could go home, or be taken home, at any time after the DNA samples were taken" and that after the 10-minute interview with Detective, he was immediately given a ride home. From this, the court concluded that "the fact he was not under arrest could not have been made more explicit than it was" and that Schaefer "was not in custody." Accordingly, the court determined that "*Miranda* warnings were not necessary" and that there was therefore "no need to examine whether [Schaefer's] request for counsel was equivocal or unequivocal." The court thus denied Schaefer's motion to suppress.

¶10 At a subsequent pretrial hearing, an unidentified woman chimed in during the proceeding, asking counsel and the court "to slow down" and explaining she was "the CART provider," which was "like an interpreter" for Schaefer.[3] Schaefer's counsel informed the court that Schaefer has "a hearing issue" but that he has a hearing aid and "can hear" and "read lips." Schaefer then addressed the court, saying he had "been asking for a transcriber from the beginning" because he was "definitely hard of hearing" and had found it difficult to follow the proceedings. But he said he was satisfied with the CART services and was "thankful to have this." The court—which had been unaware of Schaefer's hearing difficulties and the CART services—then learned that a family member of Schaefer's had contacted someone at the court "sometime before [the] hearing" to alert it to Schaefer's need for

---

3. Communication Access Realtime Translation (CART) provides "instant speech-to-text translation on a computer monitor or other display for the benefit of" those that are deaf or hard of hearing. *Captioning Matters*, Nat'l Court Reps. Ass'n, https://www.ncra.org/captioningmatters [https://perma.cc/P5QP-KCUE].

an accommodation, which the court assured Schaefer would be provided going forward.

¶11 At trial, various witnesses recounted the events outlined above. And the recording of Detective's interview with Schaefer was played for the jury—including the portion where he admitted to being in the area on the day of the incident. Schaefer was found guilty on both charges.

ISSUE AND STANDARDS OF REVIEW

¶12 On appeal, Schaefer argues that the trial court erred in denying his motion to suppress based on its conclusion that he was not in custody for *Miranda* purposes. "When reviewing the denial of a motion to suppress, we review the trial court's factual findings for clear error and its legal conclusions for correctness." *State v. Reigelsperger*, 2017 UT App 101, ¶ 36, 400 P.3d 1127 (quotation simplified), *cert. denied*, 409 P.3d 1048 (Utah 2017). "A trial court's ultimate determination that a defendant was not subject to custodial interrogation and thus was not entitled to a *Miranda* warning is a mixed question of law and fact that we also review for correctness." *Id*.[4]

---

4. Schaefer also argues that his trial counsel provided ineffective assistance by failing to investigate and counter the State's DNA evidence, arguing we should grant a remand to develop the record in support of this claim under rule 23B of the Utah Rules of Appellate Procedure. He further argues the trial court plainly erred in not providing, and his counsel was ineffective in not requesting, proper accommodations for him as a deaf individual under section 78B-1-202(1) of the Utah Code. Because we reverse Schaefer's convictions on another ground, we need not definitively decide these issues. But we take the opportunity to emphasize, by way of guidance that might be helpful on remand,

(continued…)

ANALYSIS

¶13 "The Fifth Amendment to the United States Constitution provides that no person shall be compelled in any criminal case to be a witness against himself." *State v. Fredrick*, 2019 UT App 152, ¶ 28, 450 P.3d 1154 (quotation simplified), *cert. denied*, 458 P.3d 748 (Utah 2020). "To protect this right against self-incrimination, the United States Supreme Court held, in *Miranda v. Arizona*, 384 U.S. 436 (1966), that individuals who are in police custody must be apprised of their rights prior to any questioning"—including the "right to remain silent" and "the right to the presence of an attorney." *Fredrick*, 2019 UT App 152, ¶ 28 (quotation simplified). These "*Miranda* warnings are not required every time police ask someone questions. But due to their critical importance, *Miranda* warnings must be given to a defendant subject to custodial interrogation." *State v. Jessop*, 2023 UT App 140, ¶ 38, 540 P.3d 713 (quotation simplified), *cert. denied*, 550 P.3d 998 (Utah 2024).

---

that under Utah law, "If a deaf or hard of hearing person is a party or witness at any stage of any judicial . . . proceeding," then "the appointing authority shall appoint and pay for a qualified interpreter to interpret the proceedings to the deaf or hard of hearing person." Utah Code Ann. § 78B-1-202(1) (LexisNexis 2022). A "qualified interpreter" is defined, in this context, as "a sign language or oral interpreter" who "is able to accurately communicate with and translate information to and from the hearing-impaired person involved." *Id.* §§ 78B-1-201(4), -203(1). The record submitted to us is not entirely clear regarding what CART services entail and whether those services, as rendered in this case, included the involvement of a "qualified interpreter." Accordingly, we make no pronouncement on whether the CART services provided to Schaefer were adequate under the statute, but we advise the trial court, on remand, that if Schaefer is found to be "a deaf or hard of hearing person," then he is entitled to the assistance of a "qualified interpreter" who can "provide effective communication" for him. *See id.* § 78B-1-203(2).

"Generally, custodial interrogation occurs where there is both (1) custody or other significant deprivation of a suspect's freedom and (2) interrogation." *Id.* ¶ 39 (quotation simplified).

¶14 There was no dispute before the trial court about whether Schaefer's interview with Detective satisfied this latter requirement. The court's order denying Schaefer's motion to suppress concluded he was not in custody without addressing whether the interview was an interrogation. This point was essentially conceded, as Schaefer argued briefly in his motion to suppress that the interview was an interrogation, but the State did not contest that point in its opposition or during argument on the motion. Nor is there argument about this point on appeal. Thus, it remains undisputed that the interview was an interrogation, which resulted in disclosure of incriminating evidence by Schaefer.[5]

¶15 The State argues that we may avoid deciding whether this interrogation was custodial because, even if it was, Schaefer waived his *Miranda* rights. Specifically, the State contends that Schaefer's statement, "I think I will—I will need a lawyer," was not an unequivocal assertion of his right to counsel. But we disagree, particularly with the State's argument that Schaefer's mention of counsel conveyed only his *future* desire for counsel, and we decline to affirm on this alternative basis. Schaefer made this statement immediately after being read his rights and indicating he understood them. He clarified his request, saying, "Because apparently you guys got me on a search warrant and stuff, and it seems really serious, and from what I've read, I'm going to be needing—". This was an unequivocal assertion of that right. *See Smith v. Illinois*, 469 U.S. 91, 97 (1984) (holding that a

---

5. Schaefer's admission that he was in the area of the apartment complex on the day in question was critical to the State's case given that the DNA test of B.D.'s underwear revealed only male DNA and not Schaefer's DNA specifically.

defendant's confession was inadmissible because the defendant's statement, "Uh, yeah, I'd like to do that," when asked whether he understood his right to have counsel present—"with the possible exception of the word 'uh'"—was "neither indecisive nor ambiguous") (quotation simplified); *Wood v. Ercole*, 644 F.3d 83, 91 (2d Cir. 2011) (holding that "[t]he statement 'I think I should get a lawyer' evidences no internal debate whatsoever"); *Cannady v. Dugger*, 931 F.2d 752, 755 (11th Cir. 1991) (holding that a defendant's "statement, 'I think I should call my lawyer,' was an unequivocal request for counsel"); *Smith v. Endell*, 860 F.2d 1528, 1529, 1531 (9th Cir. 1988) (holding that a defendant's statement, "Can I talk to a lawyer? At this point, I think maybe you're looking at me as a suspect, and I should talk to a lawyer. Are you looking at me as a suspect?" was "conditional" but not "equivocal or ambiguous").[6] If Schaefer was in custody at the time, the interrogation should have ended upon this unequivocal assertion. *See Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981) ("[A]n accused, . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."); *State v. Medina*, 2019 UT App 49, ¶ 12, 440 P.3d 846 ("Interrogation must cease if the accused invokes his or her right to consult with an attorney, and, with limited exceptions, the prosecution may not use any statements made by the accused taken in violation of *Miranda*'s protections.")

---

6. Although we acknowledge cases to the contrary, *see United States v. Mohr*, 772 F.3d 1143, 1146 (8th Cir. 2014) (holding that a defendant's statement, "I think I should get a lawyer," was equivocal) (quotation simplified); *Burket v. Angelone*, 208 F.3d 172, 198 (4th Cir. 2000) (holding that a defendant's statement, "I think I need a lawyer," did "not constitute an unequivocal request for counsel") (quotation simplified), we follow the cases cited in the text above, as they most clearly advance the policy served by *Miranda v. Arizona*, 384 U.S. 436 (1966).

(quotation simplified), *cert. denied*, 455 P.3d 1056 (Utah 2019). We thus turn to the question of whether—at the pivotal moment when he invoked his right to counsel—Schaefer was in custody.

¶16 "For *Miranda* purposes, 'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Jessop*, 2023 UT App 140, ¶ 40 (quotation simplified). To determine whether a suspect is in custody, we utilize a two-part test. "The initial step is to ascertain whether, in light of the objective circumstances of the interrogation, a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." *Id.* (quotation simplified). "The safeguards prescribed by *Miranda* become applicable as soon as a suspect's freedom of action is curtailed to a degree associated with formal arrest." *State v. Goddard*, 2021 UT App 124, ¶ 47, 501 P.3d 1188 (quotation simplified), *cert. denied*, 505 P.3d 55 (Utah 2022). "If the court finds that an individual's freedom of movement was not curtailed, then the person was not in custody for *Miranda* purposes and the court's analysis ends there." *Jessop*, 2023 UT App 140, ¶ 40 (quotation simplified). But "if the court does find that an individual's freedom of movement was curtailed, the focus turns to whether the relevant environment presented the same inherently coercive pressures as the type of station house questioning at issue in *Miranda.*" *Id.* (quotation simplified).

¶17 "The first part of this inquiry—whether a reasonable person would have felt free to leave—is an objective one." *Id.* ¶ 41 (quotation simplified). "In order to determine how a suspect would have gauged his freedom of movement, courts must examine all of the circumstances surrounding the interrogation." *Id.* (quotation simplified). *Accord Goddard*, 2021 UT App 124, ¶ 44. "Relevant factors include, but are not limited to, the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of

the questioning." *Jessop*, 2023 UT App 140, ¶ 41 (quotation simplified).

¶18    Here, it is undisputed that Schaefer was in custody while his DNA was collected. But custody did not terminate there. *Cf. Goddard*, 2021 UT App 124, ¶ 47 (discussing how, during a traffic stop, "if an individual is temporarily detained but thereafter is subjected to treatment that renders him in custody for practical purposes, he will be entitled to the full panoply of protections prescribed by *Miranda*") (quotation simplified). And again, in determining whether Schaefer was in custody at the moment he stated he wanted a lawyer, we must "examine *all* of the circumstances surrounding" the interrogation. *Jessop*, 2023 UT App 140, ¶ 41 (emphasis added, quotation simplified).

¶19    Schaefer was brought to the police station by Detective, pursuant to a warrant. *Cf. State v. Fullerton*, 2018 UT 49, ¶ 31, 428 P.3d 1052 (recognizing that a defendant was not in custody, in part, because he "*voluntarily* had his father drive him to the police station" and "his father waited at the station for him the entire time") (emphasis added); *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) (pointing to the fact that "police did not transport [the defendant] to the station or require him to appear at a particular time" as weighing against a finding of custody); *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam) (concluding that the defendant was not in custody in large part because he "came voluntarily to the police station"). At the station, Schaefer was isolated in an interview room. Two armed officers—one of whom entered and exited the room several times—took pictures of Schaefer and collected his blood and saliva samples, each time closing the door behind them. During transportation to the station, Schaefer was placed in a waist belt and handcuffs. During the DNA collection, he remained in the waist belt. And while the handcuffs were removed from his wrists, they were attached to the belt and rested in his lap.

¶20 After his DNA was collected, Schaefer sat in the interview room with the door closed and still in the waist belt until Detective, also armed, entered, closing the door behind him. Detective immediately told Schaefer, "Clearly you're the subject of an investigation," before reading Schaefer his rights. While "[s]tatus as a suspect does not necessarily impose a warning requirement," "a detective's beliefs concerning an individual's potential culpability are relevant . . . to the extent they would affect how a reasonable person in that position would perceive his or her freedom to leave." *State v. Reigelsperger*, 2017 UT App 101, ¶ 56, 400 P.3d 1127 (quotation simplified), *cert. denied*, 409 P.3d 1048 (Utah 2017). *See State v. MacDonald*, 2017 UT App 124, ¶ 23, 402 P.3d 91 ("[E]ven when police disclose that they suspect the interviewee of a crime, that disclosure may not bear great weight in the custody analysis where other objective indicia of arrest are absent."). Given the totality of the other circumstances here, this would have contributed to a reasonable person's perception of the environment as custodial.

¶21 Thus, we conclude a reasonable person would not have felt free to leave before the interrogation began or at the point in time when Schaefer asked for an attorney. In that moment, he had not been advised during the custodial interrogation that he could go home, and he was still wearing the waist belt to which handcuffs were attached. But this "is only the first step in the custody analysis." *MacDonald*, 2017 UT App 124, ¶ 24. Under the second step, we must also determine "whether the relevant environment presented the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Jessop*, 2023 UT App 140, ¶ 40 (quotation simplified).

¶22 "Of course, any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." *MacDonald*, 2017 UT App 124, ¶ 32 (quotation simplified).

But "[i]n the paradigmatic *Miranda* situation—[in which] a person is arrested in his home or on the street and whisked to a police station for questioning—detention represents a sharp and ominous change, and the shock may give rise to coercive pressures." *Howes v. Fields*, 565 U.S. 499, 511 (2012).

¶23     In *Miranda v. Arizona*, 384 U.S. 436 (1966), the United States Supreme Court discussed such coercive pressures in considering four defendants' challenges to their respective custodial interrogations. The Court noted that each defendant had been questioned "in a room in which he was cut off from the outside world," "thrust into an unfamiliar atmosphere," and "run through menacing police interrogation procedures." *Id.* at 445, 457. In such settings, the defendants were subjected to "incommunicado interrogation . . . in a police-dominated atmosphere" that emphasized the "invincibility of the forces of the law," resulting in "self-incriminating statements without full warnings of constitutional rights." *Id.* at 445, 450 (quotation simplified). The Court stressed that "the very fact of custodial interrogation exacts a heavy toll on individual liberty and trades on the weakness of individuals." *Id.* at 455.

¶24     We conclude that when he invoked his right to an attorney, Schaefer's interrogation carried the same "badge of intimidation" that animated the Court's concern in *Miranda. Id.* at 457. Again, Schaefer was taken from home pursuant to a warrant and isolated in a small interview room at the police station—a setting that is "inherently coercive." *State v. Goddard*, 2021 UT App 124, ¶ 51, 501 P.3d 1188, *cert. denied*, 505 P.3d 55 (Utah 2022). The door to the interview room remained shut, except as armed officers entered and exited. Schaefer still wore the waist belt to which his handcuffs were attached, and he would not have been free to leave until they were removed, which he could not have done himself. This environment signaled to Schaefer that he was "completely at the mercy of the police officers." *MacDonald*, 2017

UT App 124, ¶ 36. Thus, the interrogation imposed many of the same coercive pressures as were at issue in *Miranda*.

¶25    In sum, because a reasonable person in Schaefer's shoes would not have felt free to leave before the interrogation started or at the time he asked for an attorney, and because, at this point in time, the interrogation presented the same inherently coercive pressures at issue in *Miranda*, we conclude that Schaefer was in custody when he invoked his right to counsel and that the trial court erred in concluding otherwise. To be sure, later in the interrogation, Detective told Schaefer he was free to go home, and Detective eventually did take him home. But this is irrelevant. The interrogation should not have persisted beyond Schaefer's invocation of his right to counsel.

¶26    Our analysis does not end here, however. "Even if there is error on the part of the trial court, an error is harmless and does not require reversal if it is sufficiently inconsequential that we conclude there is no reasonable likelihood that the error affected the outcome of the proceedings." *State v. Hernandez*, 2024 UT App 71, ¶ 25, 549 P.3d 643 (quotation simplified), *cert. denied*, 558 P.3d 86 (Utah 2024). "However, when addressing claims involving the violation of a federally protected constitutional right, federal law sets a higher standard and instructs that we cannot declare federal constitutional error harmless unless we sincerely believe that it was harmless beyond a reasonable doubt." *Id.* (quotation simplified). In *Hernandez*, we applied the heightened "harmless beyond a reasonable doubt" standard to a violation of *Miranda*. *Id.* ¶ 28. But in its decision in *Vega v. Tekoh*, 597 U.S. 134 (2022), the United States Supreme Court held that *Miranda* warnings are "a set of prophylactic *rules*" that "are not themselves rights protected by the Constitution" and thus, "a violation of *Miranda* does not necessarily constitute a violation of the Constitution," *id.* at 142, 145, 150 (emphasis added, quotation simplified), suggesting the heightened standard would not apply to *Miranda* violations. But we need not decide which is the proper standard.

¶27 A crucial piece of the State's case was Schaefer's admission—elicited during the interrogation after he invoked his right to counsel—that he was in the area of the apartment complex on the day of B.D.'s abuse. *See supra* note 5. The other evidence, including DNA and witness descriptions of Schaefer, what he wore on the day of the incident, whether he had glasses, and what kind of car he drove, was entirely circumstantial. Thus, there is a reasonable likelihood that, on this evidence alone, the jury would not have convicted him. And absent Schaefer's admission, the prosecution's case was comparatively weak. *See generally Hernandez*, 2024 UT App 71, ¶ 28 (noting factors relevant to the harmless beyond a reasonable doubt standard, including "the importance of the evidence to the prosecution's case, whether the evidence was cumulative, and, of course, the overall strength of the prosecution's case") (quotation simplified). We conclude that under either standard for assessing harmless error, the trial court's denial of Schaefer's motion to suppress was harmful, entitling him to reversal.

## CONCLUSION

¶28 Because the trial court denied Schaefer's motion to suppress based on its incorrect conclusion that he was not in custody when he invoked his right to an attorney, we reverse his convictions. We remand for a new trial in which the incriminating statements made during his custodial interrogation must be suppressed.

———————